# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### September 5, 2001 Session

## BERNICE ROTHSTEIN, ET AL. v. ORANGE GROVE CENTER, INC., ET AL.

**Appeal by Permission from the Court of Appeals, Eastern Division**
**Circuit Court for Hamilton County**
**No. 95CV2147     W. Neil Thomas, III, Judge**

---

**No. E1999-00900-SC-R11-CV - Filed November 29, 2001**

---

We granted appeal to determine 1) whether the defendants are entitled to a new trial based upon their claim that the trial court erred in admitting certain evidence from four different sources, and 2) whether the trial court erred in dismissing the plaintiffs' claim for consortium damages and, if so, the proper remedy for that error. We hold that the four evidentiary issues are without merit. The defendants therefore are not entitled to a new trial. We further hold, pursuant to our decisions in Jordan v. Baptist Three Rivers Hospital, 984 S.W.2d 593 (Tenn. 1999), Hill v. City of Germantown, 31 S.W.3d 234 (Tenn. 2000), and Hancock v. Chattanooga-Hamilton Hospital Authority, 54 S.W.3d 234 (Tenn. 2001), that the plaintiffs may maintain a claim for loss of filial consortium. We remand this case for a trial on the issue of incidental damages, limited to loss of consortium.

**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgment of the Court of Appeals Affirmed in Part and Reversed in Part; Case Remanded**

JANICE M. HOLDER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., and WILLIAM M. BARKER, JJ., joined.

David Earl Harrison and Tonya Kennedy McIntosh Cammon, Chattanooga, Tennessee, for the appellant, Christopher D. Prater, M.D.

Thomas H. Dundon and William David Bridgers, Nashville, Tennessee, for the appellees, Aaron Rothstein, Bernice Rothstein, and Lisa G. Rothstein.

Samuel Richard Anderson, Chattanooga, Tennessee, for the appellee, Orange Grove Center, Inc.

# OPINION

## Factual and Procedural Background

Bernice and Aaron Rothstein brought a wrongful death action for the death of their daughter, Lisa Rothstein. Lisa, a thirty-five-year-old woman who was mentally retarded, lived in Orange Grove Center, Inc. ("Orange Grove"), a group home in Chattanooga, Tennessee. While living at Orange Grove, Lisa died of bacterial meningitis. The Rothsteins filed suit against Orange Grove and Dr. Christopher Prater, the physician retained by Orange Grove to provide medical care to its residents. The Rothsteins allege that Dr. Prater committed medical malpractice and that Orange Grove was negligent in its care of Lisa.

At the time of Lisa's death, she had resided primarily at Orange Grove for twenty-one years. Beginning on approximately November 17, 1994, and until her death on November 23, 1994, Lisa suffered at various times from a headache, fever, vomiting, and erratic behavior. Debbie LaDuke, Lisa's house mother and house manager, took Lisa to the Orange Grove Clinic on November 18, 1994, for an examination by Dr. Prater. Dr. Prater, however, was unavailable. He became aware of Lisa's symptoms on November 19 while he was in Knoxville, Tennessee. Because Dr. Prater was unavailable to examine Lisa until November 22, Mrs. LaDuke remained in contact with the on-call nurse, Susan Kelly, and other staff members at Orange Grove concerning Lisa's condition. These nurses and staff members contacted Dr. Prater concerning Lisa's illness. Based upon Lisa's symptoms of a headache and fever reported to Dr. Prater by Mrs. LaDuke and the nurses, Dr. Prater concluded that Lisa had a viral illness for which antibiotics were not necessary.

Lisa continued to have a headache and fever throughout the course of her illness. Dr. Prater instructed the nurses and Mrs. LaDuke to administer Tylenol and Advil to Lisa. On November 21, Mrs. LaDuke attempted again to have Lisa examined by Dr. Prater. Dr. Prater was still unavailable. Prior to Dr. Prater's return, several staff members met with Lisa, including Ruth Toon, Senior Coordinator for Residential Services at Orange Grove, and Barbara Boger, Residential Manager for Orange Grove. Telephone slips maintained by the staff at the Orange Grove Clinic indicate that Dr. Prater and other personnel were aware of Lisa's symptoms and condition and had numerous telephone conversations with Mrs. LaDuke.

Dr. Prater examined Lisa on November 22. He recorded that Lisa had viremia.[1] Dr. Prater's assessment of Lisa was that she was improving clinically, that her temperature was down, and that she was acting normally. Dr. Prater ordered that a complete blood count ("CBC") be conducted. Lisa's temperature continued to be elevated, and she continued to complain of a headache.

After Dr. Prater's examination on November 22, Mrs. LaDuke returned Lisa to her residence at Orange Grove. Eleven telephone calls were noted between various Orange Grove employees, including Dr. Prater, Barbara Boger, and Mrs. LaDuke, concerning Lisa's behavior and breathing

---

[1]Viremia is a viral infection of the bloodstream which can infect the body's organs.

difficulty. Dr. Prater was informed of Lisa's condition by the on-call nurse, Debbie LaRosh. Dr. Prater advised Nurse LaRosh to tell Mrs. LaDuke to place Lisa in a dark, quiet room to determine if her agitation and breathing difficulty would subside. Mrs. LaDuke followed Dr. Prater's instructions, and Lisa's breathing difficulty and agitation subsided. Lisa was found not breathing on the morning of November 23, between 5:00 a.m. and 6:00 a.m. She was pronounced dead at East Ridge Hospital. An autopsy revealed that the cause of death was bacterial meningitis. The bacterial agent was streptococcus pneumoniae.

Carol Burhenn was an Orange Grove nurse who aided in Lisa's treatment. After Lisa's death, Ms. Burhenn made entries to Lisa's medical record that were described by her as late entries. One of the entries noted her conversation with Dr. Prater on the night of November 22. In that conversation, Dr. Prater told Ms. Burhenn that Lisa should have another blood test after Thanksgiving because of Lisa's previous lab results. He also stated that Lisa probably had viral encephalitis.[2]

Sometime on the morning of November 23, 1994, Dr. Prater telephoned the Rothsteins' home and spoke with Roberta Spinner, a nurse who was a family friend of the Rothsteins. Dr. Prater told Ms. Spinner that it appeared that Lisa had died from a seizure. On the same night, Dr. Prater spoke with James Arceo, an employee of the Tennessee Donor Services, regarding Lisa's medical history and condition at the time of her death. The purpose of the call was to determine if Lisa's organs should be harvested. Dr. Prater told Mr. Arceo that it appeared that Lisa had died of a seizure, that she had suffered from a viral infection that was like a cold virus, and that she was improving at the time of her death. He further informed Mr. Arceo that the initial CBC performed on Lisa was out of range, but that the next CBC was approaching normal.[3]

Prior to trial, the trial court dismissed the Rothsteins' claim for loss of consortium. The jury returned a verdict in favor of the Rothsteins in the amount of $275,000. The jury apportioned twenty percent of the fault to Orange Grove and eighty percent to Dr. Prater. After post-trial motions were filed by all parties, the trial judge suggested a remittitur of the award to $200,000, which the Rothsteins accepted under protest.

All parties sought appellate review. The Rothsteins challenged the trial court's ruling precluding their claim for loss of consortium. Orange Grove and Dr. Prater appealed the trial court's admission of certain lay and expert witnesses' testimony and the admission of telephone slips made after Lisa's death. The Court of Appeals affirmed the trial court on all issues.

---

[2]The record reflects that numerous definitions and explanations were proposed for Dr. Prater's reference to the diagnosis of "viral encephalitis." Generally, however, encephalitis refers to an inflammation of the brain.

[3]The only CBC conducted on Lisa was performed on November 22, 1994.

## Analysis

### I. Evidentiary Issues

The admissibility of evidence is within the discretion of the trial judge and will be overturned only when there is an abuse of discretion. Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 442 (Tenn. 1993) (citations omitted).

### A. The Admissibility of the Testimony of Roberta Spinner and James Arceo

Dr. Prater and Orange Grove maintain that the trial court erred in admitting the testimony of Roberta Spinner and James Arceo because 1) their testimony was irrelevant and more prejudicial than probative; and 2) their testimony would permit inference stacking. We disagree with both contentions. Evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence that is relevant may still be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . or needless presentation of cumulative evidence." Tenn. R. Evid. 403. These witnesses testified concerning their conversations on November 23 with Dr. Prater following Lisa's death. Roberta Spinner and James Arceo both testified that Dr. Prater told them Lisa appeared to have died from a seizure. Dr. Prater also told Mr. Arceo that Lisa had a viral infection that was improving at the time of her death.

Through this testimony, the Rothsteins sought to establish that Dr. Prater attempted to deflect attention from Lisa's condition on the evening of November 22 by deceiving the Rothsteins about the care Lisa received and the seriousness of her illness. The testimony of Mr. Arceo and Ms. Spinner, if credited by the trier of fact, provided evidence that Dr. Prater misled the Rothsteins concerning the progression and severity of Lisa's illness. Dr. Prater's statements are probative of whether he knew he breached the standard of care and was attempting to conceal his knowledge of the breach. Moreover, the admission of the testimony of Ms. Spinner and Mr. Arceo did not permit inference stacking. A jury may draw an inference from evidence before it, whether the evidence is direct or circumstantial. Benton v. Snyder, 825 S.W.2d 409, 414 (Tenn. 1992). "A fact may be inferred from circumstantial evidence, and from the fact thus inferred, another fact may be inferred without contravening the rule that an inference cannot be based on an inference." Id. at 415. We conclude that the trial court did not err in admitting the testimony of Ms. Spinner and Mr. Arceo.

### B. The Admissibility of the Testimony of William Storer

At trial, the Rothsteins elicited the testimony of William Storer, a handwriting expert. Mr. Storer testified that some of the November 22 entries made by Dr. Prater in Lisa's medical record were not made on the same surface as other November 22 entries, or with the same pen, or both. From this evidence, Mr. Storer opined that these entries were not made in "immediate sequence" with the preceding November 22 entries.

The defendants allege that the trial court erred in admitting Mr. Storer's testimony because the testimony could not "substantially assist the trier of fact to understand the evidence or determine a fact in issue." Tenn. R. Evid. 702. Further, the defendants argue that the evidence should have been excluded because Mr. Storer's testimony was speculative, invited the trier of fact to engage in impermissible inference stacking, and related to Dr. Prater's credibility.

Mr. Storer was established to be an expert in the area of handwriting. His testimony could have substantially assisted the jury in determining what caused the apparent differences in the questioned medical record entries. The testimony was evidence that the questioned entries were made at another time than the entries directly preceding them in the record dated November 22. From that evidence the jury could have permissibly inferred that the entries were made after Lisa's death to conceal a breach of the standard of care. See Snyder, 825 S.W.2d at 415.

Mr. Storer's testimony may have brought into question when Dr. Prater made these entries. This testimony, however, is not impermissibly related to Dr. Prater's credibility. Rule 702 does not require that an expert be neutral. See Neil P. Cohen, Donald F. Paine, & Sarah Y. Sheppeard, Tennessee Law of Evidence, §7.02[3], 7-20 (2000). An expert's purpose is to provide an opinion about a disputed issue. The opinion will often vary from the opinion of other experts and may contradict factual testimony from other witnesses. See, e.g., Edwards v. State, 540 S.W.2d 641 (Tenn. 1976). Mr. Storer was not commenting upon Dr. Prater's truthfulness. Mr. Storer was testifying only as to his observation of the medical record and as to his expert conclusions based upon those observations. His testimony did not evaluate or comment upon Dr. Prater's credibility. See Herbert v. Brazeale, 902 S.W.2d 933, 937 (Tenn. Ct. App. 1995). The trial court, therefore, did not err in admitting Mr. Storer's testimony.

## C. The Admissibility of Telephone Slips Made After Lisa's Death

The trial court admitted telephone slips written by Nurse LaRosh on November 25 memorializing conversations between her and Dr. Prater. The slips related to the steps Mrs. LaDuke and her husband should take if they exhibited signs of fever accompanied by a headache. Because the LaDukes both were exposed to bacterial meningitis, they were advised to seek emergency care if they exhibited these symptoms of the disease.

The defendants argue that the telephone slips are a subsequent remedial measure and should have been excluded under Rule 407 of the Tennessee Rules of Evidence. Rule 407 provides that "[w]hen, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent remedial measures is not admissible to prove . . . negligence, or culpable conduct in connection with the event." Tenn. R. Evid. 407. We disagree that this is the type of evidence contemplated by Rule 407 as a subsequent remedial measure.

The telephone slips reflect Dr. Prater's warning to two people who were exposed to Lisa while she was ill. The slips reflect conversations after Lisa's death. In that sense, the slips show action "subsequent" to the events triggering the lawsuit. The warning to the LaDukes, however, is

not "remedial" in the sense contemplated by Rule 407. "Remedial" action contemplates changing a situation, usually an unsafe property or product, to prevent the situation from causing further injury. See, e.g., Thompson v. Thompson, 749 S.W.2d 468 (Tenn. Ct. App. 1988); Belote v. Memphis Dev. Co., 369 S.W.2d 97 (Tenn. Ct. App. 1962).

At best, the warning to the LaDukes may be relevant to show Dr. Prater's knowledge, post-autopsy, that fever and a headache may signal bacterial meningitis. The warning is not, however, remedial. The warning, standing alone, would not have made Lisa's death less probable. The plaintiffs claim that Dr. Prater's negligence was in failing to properly diagnose the disease, not in failing to warn Lisa or her caretakers that certain symptoms could signal a disease. A warning such as that given to the LaDukes would not necessarily have produced a proper diagnosis. We hold that the telephone slips were properly admitted into evidence.

## II. Filial Consortium Damages Claim

We held in Jordan v. Three Rivers Baptist Hospital, 984 S.W.2d 593 (Tenn. 1999), that loss of consortium is compensable for wrongful death under Tenn. Code Ann. § 20-5-113. On October 20, 2000, in Hill v. City of Germantown, 31 S.W.3d 234 (Tenn. 2000), we held that Jordan applied retroactively to all cases tried or retried after Jordan and to all cases pending on appeal in which the issue decided in Jordan was raised at an appropriate time. On August 31, 2001, in Hancock v. Chattanooga-Hamilton County Hospital Authority, 54 S.W.3D 234 (Tenn. 2001), we extended our holding in Jordan to allow a parent to recover under Tenn. Code Ann. § 20-5-113 for loss of filial consortium. Because Jordan applies retroactively and Hancock allows recovery of filial consortium damages under Tenn. Code Ann. § 20-5-113, the decision of the Court of Appeals is reversed as to the issue of consortium damages. The Rothsteins may seek recovery for loss of filial consortium.

The remaining issue is the procedure that the trial court must follow on remand. A jury verdict was returned in favor of the Rothsteins in the amount of $275,000 for Lisa's pain and suffering. The trial judge remitted this amount to $200,000, which the Rothsteins accepted under protest. The Court of Appeals affirmed the trial court's remittitur, and the Rothsteins have not contested the remittitur in this Court.

The wrongful death statute provides as follows:

> Where a person's death is caused by the wrongful act, . . . of another, and suit is brought for damages, as provided for by §§ 20-5-106 and 20-5-107, the party suing shall, if entitled to damages, have the right to recover for the mental and physical suffering, loss of time, and necessary expenses resulting to the deceased from the personal injuries, and also the damages resulting to the parties for whose use and benefit the right of action survives from the death consequent upon the injuries received.

Tenn. Code Ann. § 20-5-113. The statute allows for the recovery of two types of damages in a wrongful death action. Under the first prong, the survivor is entitled to damages sustained by the deceased from the time of injury until the time of death. See Jordan, 984 S.W.2d at 598. These damages include the mental and physical pain and suffering of the deceased. The second prong of damages allows survivors of the deceased to recover for their losses suffered as a result of the death. See id. This second type of damages includes incidental damages suffered by the decedent's next of kin. Id. at 600. Incidental damages include the pecuniary value of the decedent's life, which encompasses consortium damages. Id. at 602. Consortium damages include the loss of "attention, guidance, care, protection, training, companionship, cooperation, affection, love, and in the case of a spouse, sexual relations." Id.

Generally, a party has the right to have one jury determine all the issues at one time. Hurt v. Earnhart, 539 S.W.2d 133, 136 (Tenn. Ct. App. 1976) (citing Tenn. Const. Art. 1, § 6). An exception to this rule applies to cases in which liability is affirmed but an error has been committed in the assessment of damages. Id. Under these circumstances, the case may be remanded for a different jury to assess the proper amount of damages. Id. In this case, we have affirmed the lower court's ruling on the issue of liability. We have held, however, that the trial court erred in failing to instruct the jury on the Rothsteins' claim for consortium damages.

When a general verdict is affirmed as to the issue of liability but reversed on the award of damages, we normally remand for a new trial on all of the elements comprising the monetary award. See, e.g., Holder v. Drake, 908 S.W.2d 393 (Tenn. 1995). We need not do so in this case. Although the verdict was a general verdict, it is clear that the trial court charged the jury only as to the one requested element of damages included in the first prong of damages in the wrongful death statute. The jury was instructed that it could award damages for the mental and physical pain and suffering of the deceased from the onset of her illness to her death. The verdict is as clear and limited as if a special interrogatory had been answered by the jury.

The trial court did not instruct the jury on the second prong of damages permitted under the wrongful death statute. Damages under this prong include the pecuniary value of the decedent's life, which encompasses damages for loss of consortium. Jordan, 984 S.W.2d at 602. Of the damages permitted under this prong, the plaintiffs sought only damages for loss of filial consortium. The request for loss of filial consortium was not submitted to the jury for its consideration. We must, therefore, presume that the jury followed the trial court's instructions, State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998), and limited the damages to pain and suffering. Under these circumstances, and in the interest of judicial economy, we remand this case to the trial court for a new trial on the issue of loss of filial consortium. Compare Brockie v. Omo Constr., Inc., 887 P.2d 167 (Mont. 1995) (remanding for new trial on survivorship damages); Crowe v. Stewart Mach. Co., 1994 WL 516612 (E.D. La. 1994) (remanding for a new trial on past medical expenses); Thatch v. Mo. Pac. R.R. Co., 362 N.E.2d 1064, 1069 (Ill. App. Ct. 1977) (remanding for a new trial to reduce damages).

## Conclusion

We hold that the Rothsteins are entitled to seek damages for loss of filial consortium and remand the case to the trial court for a new trial on this issue only. We further hold that the trial court did not err in admitting the testimony of Roberta Spinner, James Arceo or William Storer. Because the telephone slips made after Lisa's death are not a subsequent remedial measure, the trial court did not err in admitting the slips into evidence. The holding of the Court of Appeals is affirmed in part and reversed in part. Costs of this appeal are taxed to the defendants, Orange Grove Center, Inc., and Dr. Christopher D. Prater, for which execution may issue if necessary.

<br>

_____
JANICE M. HOLDER, JUSTICE