IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 16, 2007 Session

# IN THE MATTER OF L.A.J., III
# STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v. LARRY JONES, JR.

### An Appeal from the Juvenile Court for Tipton County
### No. J21023-13-177     William A. Peeler, Judge

---

### No. W2007-00926-COA-R3-PT - Filed November 15, 2007

---

This case involves the termination of parental rights. The child at issue was born in 1992. In 2000, the child was taken into protective custody based on allegations that the father had sexually abused him. A no-contact order was entered against the father. The mother regained custody of the child in 2002. In April 2003, the mother voluntarily relinquished custody of the child and he was placed with his aunt and uncle. After the child kicked his pregnant aunt in the stomach, custody was returned to the Department of Children's Services ("DCS"). In June 2003, the child was found to be dependent and neglected. After the father failed to comply with the child's permanency plan, DCS filed a petition for termination of parental rights as to both the mother and the father. Default judgment was granted as to mother. The court appointed an attorney to represent the father. A trial was held, after which the court ordered termination of the father's parental rights on several grounds. The father appeals, arguing, *inter alia,* that the failure to appoint an attorney for him during the dependency and neglect proceedings violated his due process rights. Finding that the dependency and neglect proceedings are separate and distinct from the termination proceedings, we hold that the father received full procedural protection in the termination proceedings that are the subject of this appeal, and affirm the trial court's decision.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., and DAVID R. FARMER, J., joined.

Richard D. Cartwright, Covington, Tennessee, for Appellant Larry Jones, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter, and Elizabeth C. Driver, Assistant Attorney General, Nashville, Tennessee, for the State of Tennessee, Department of Children's Services

**OPINION**

The child at issue in this case ("L.A.J.") was born in Tipton County Tennessee, on October 6, 1992, to Larry Jones, Jr. ("Father") and Felia Brown Eubanks ("Mother"). As a young child, L.A.J. lived alternately with Father and with his uncle, Father's brother, Rodney Jones ("Uncle"), during the numerous time periods when Father was in jail or prison for days or months at a time. Mother offered little or no parental assistance during Father's absences.
.

In 1996, Father was incarcerated. As a result, the Tipton County Juvenile Court granted temporary custody of L.A.J. to Uncle. About a year later, L.A.J. was returned to Father's custody. In September of 2000, however, the Lauderdale County Juvenile Court issued an order permitting the Department of Children's Services ("DCS") to take L.A.J. into protective custody based on allegations that Father had sexually abused L.A.J. In light of the alleged sexual abuse, the Juvenile Court also issued a no-contact order against Father.

In October 2002, Mother regained custody of L.A.J. This did not last long. On April 15, 2003, Mother signed a Voluntary Placement Agreement ("VPA") that permitted DCS to place L.A.J. in foster care, ostensibly until Mother could again assume responsibility for his welfare. After Mother relinquished custody of L.A.J., DCS sent him to live with Uncle. This arrangement was soon terminated; in a violent outburst, L.A.J. kicked Uncle's wife, then eight months pregnant, in the abdomen, resulting in her hospitalization. L.A.J. was swiftly returned to the custody of DCS. After an initial placement at a Level IV facility that provided in-patient psychiatric services, L.A.J. was eventually moved to the Coteswood Group Home ("Coteswood") in Memphis, a Level III residential facility.

On June 3, 2003, the Tipton County Juvenile Court ratified and approved the VPA between Mother and DCS, and adjudicated L.A.J. to be dependent and neglected. In July 2003, DCS filed a motion with the Juvenile Court for ratification of the original permanency plan prepared for L.A.J. The Juvenile Court declined to ratify this permanency plan. However, on July 22, 2004, the Juvenile Court ratified a revised permanency plan. The goal of the revised plan was to reunify L.A.J. with his parents. Because of the unresolved allegations of sexual abuse,[1] the plan prohibited any contact between L.A.J. and Father, but required both Father and Mother to maintain contact with DCS. The revised plan called for Mother to visit with L.A.J. for a minimum of four hours per month and attend parenting and counseling sessions.

Mother and Father made little progress toward meeting the goals and requirements set forth in the revised permanency plan. Consequently, in April 2006, DCS prepared a new permanency plan (the "new plan") for L.A.J. In light of the parents' failure to remedy the conditions that initially brought L.A.J. into DCS custody, the goal of the new plan was changed from reunification to adoption. The new plan required Father to return to court and address the allegations underlying the

---

[1]The revised permanency plan also refers to allegations of sexual abuse against L.A.J.'s half-brother as well; for this reason the plan also prohibits the half-brother from having any contact with L.A.J.

no-contact order that was still in place. It also required him to complete parenting, alcohol and drug, and sexual abuse counseling; to have a written report sent to DCS confirming that he had satisfactorily completed such counseling; and to obtain a stable home and job. A meeting was set up for DCS to discuss the new plan with Mother and Father. L.A.J.'s case manager contacted Father and offered to give him a ride to the meeting; Father declined, telling the case manager that he had a ride to the meeting and would see her there. Despite Father's assurances, neither Father nor Mother attended the meeting. The Juvenile Court ratified the new plan on June 14, 2006.

On August 30, 2006, DCS filed with the Juvenile Court a petition to terminate Father's and Mother's parental rights. As grounds for termination, the petition asserted abandonment, substantial non-compliance with the permanency plan, and persistence of the conditions that led to removal of L.A.J. from parents' home. The petition further asserted that termination of both parents' rights was in L.A.J.'s best interests.

Neither Mother nor Father filed a response to the petition for termination of their parental rights. Consequently, DCS filed a motion for default judgment against both parents. At the hearing on the motion for default judgment, the Juvenile Court granted the motion for default judgment against Mother, terminating her parental rights. Father, however, appeared at the hearing and asked the Court to appoint an attorney to represent him. Father was found to be indigent, an attorney was appointed, and the motion for default judgment was withdrawn as to him.

On January 18 and January 25, 2007, the Juvenile Court conducted a trial on the petition to terminate Father's parental rights. At the outset of the trial, the Court heard testimony from Larry Crismon ("Crismon"), a clinician at Coteswood and L.A.J.'s counselor.

Crismon's testimony indicated that L.A.J. had many challenges. Crismon testified that L.A.J. was classified as "severely emotionally disturbed," with depressive episodes, attention deficit hyperactivity disorder, oppositional defiance disorder, and signs of intermittent explosive disorder. In the eighth grade at the time of trial, L.A.J. had an I.Q. of seventy-five. After a history of repeated incidents requiring physical restraint, Crismon testified that L.A.J. had made substantial improvements during his time at Coteswood.

Crismon was asked about how L.A.J. felt about the possible termination of his Father's parental rights. Crismon said that L.A.J. seemed almost completely unaffected by that possibility, and indicated that, during the five months in which he had counseled L.A.J., Crismon had to initiate any discussions about Father because L.A.J. never brought up the subject.[2] Crismon observed that L.A.J. seemed uninterested in the subject of his relationship with Father.

The trial court also heard testimony from Teresa Harris ("Harris"), L.A.J.'s case manager. Harris testified about Father's efforts to fulfill the requirements of the new permanency plan that had

---

[2]Father's attorney objected to Crismon's testimony regarding discussions he had with L.A.J. about the termination proceedings, arguing that it was inadmissible hearsay. The court overruled this objection.

been prepared in April 2006. According to Harris, Father completed parenting classes in 2000, but did not engage in counseling, obtain alcohol and drug treatment, or obtain a recommendation from his counselor as required by the plan in order to have the no-contact order lifted. The permanency plan required Father to obtain a stable home and job; Father never contacted Harris to inform her that he had completed either task or even to give her an updated address.

Uncle testified as well. Father lived with Uncle briefly after Father's most recent release from jail, but at the time of trial, Father was apparently living with his girlfriend. Although Father and Uncle did some work in construction, Uncle testified that Father did not have a regular job or any stable source of income.[3]

Father also testified at trial. He was asked about his efforts to visit and support L.A.J. The evidence indicated that he did not meet the requirements to lift the no-contract order, and that the no-contact order prevented Father from visiting or otherwise contacting L.A.J. directly. Father acknowledged, however, that during the time in which L.A.J. had been out of his custody, he had never sent any money to support L.A.J. Moreover, Father conceded that he made no effort to contact the DCS case manager assigned to L.A.J. in order to inquire about L.A.J.'s well-being.

Father's history of being arrested and incarcerated was established through exhibits and Father's testimony. In January 1998, Father pled guilty to charges of possession of marijuana and public intoxication. In March 2003, Father pled guilty to a charge of forgery. In April 2006, Father was arrested for driving under the influence of alcohol and in December 2006, he was arrested for public intoxication and misdemeanor theft. Father testified that, at the time of trial, he was under house arrest based on his August 2004 conviction for reckless aggravated assault.

After hearing the testimony and reviewing the evidence, the Juvenile Court granted the DCS petition to terminate Father's parental rights. The court found that L.A.J. had been abandoned as that term is defined in Tennessee Code Annotated § 36-1-102(1)(A)(ii); that Father had failed to substantially comply with the provisions of the permanency plan; and that L.A.J. had been removed from Father's custody for more than six months and the conditions that led to the removal persisted. The Court found that termination of Father's parental rights was in L.A.J.'s best interests because (1) Father had not made an adjustment of his circumstances or conduct such that it would be safe for L.A.J. to live with Father; (2) Father had failed to make a lasting adjustment after the reasonable efforts of social services; (3) Father had failed to establish a meaningful relationship with L.A.J.; (4) a change in L.A.J.'s caretakers and physical environment would likely have a negative effect on L.A.J.'s emotional, psychological, and medical condition; (5) Father's use of alcohol or other substances would render him consistently unable to care for L.A.J.; (6) Father's mental and emotional status would be detrimental to L.A.J. and would prevent Father from providing care and supervision of L.A.J.; and (7) Father had failed to pay child support for L.A.J. Based on these findings, the Juvenile Court held that there was clear and convincing evidence to establish the

---

[3]Father indicated that he and his brother worked roughly two jobs per month and had to make the money from those jobs last during times when they were not working.

grounds for the termination of Father's parental rights and to establish that such termination was in L.A.J.'s best interest. Accordingly, the Juvenile Court ordered the termination of Father's parental rights and awarded full guardianship and custody of the child to DCS. Father now appeals this order.

On appeal, Father raises several issues for review. Father argues that (1) the Juvenile Court's failure to appoint an attorney to represent Father prior to the hearing on the motion for default judgment was a violation of Father's due process rights; (2) the Juvenile Court erred when it found that Father had willfully failed to visit or support his son; (3) the termination of Father's parental rights absent proof of a risk of substantial harm to L.A.J. was a violation of Father's due process rights; (4) the Juvenile Court erred by considering criminal convictions that occurred more than ten years before the trial; (5) the Juvenile Court erred by allowing a witness to testify to statements made to him by L.A.J. that were not related to injury or abuse; and (6) termination of Father's parental rights was not in L.A.J.'s best interest.

While a biological parent has a fundamental constitutional right to the care and custody of his child, this right is not absolute. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). The fundamental right of a parent may be abridged only upon a determination that the parent has voluntarily relinquished the right, abandoned his or her child, or has otherwise engaged in conduct requiring its abridgment. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002).

In Tennessee, proceedings to terminate parental rights are governed by statute. *See generally* T.C.A. § 36-1-113 (2005). In order to terminate a biological parents' parental rights, the petitioner must first prove at least one of the statutory grounds for termination of parental rights. T.C.A. § 36-1-113(c)(1) (2005); *see also* T.C.A. § 36-1-113(g) (2005). Once grounds for termination have been proven, the petitioner must establish that termination is in the best interest of the child. T.C.A. § 36-1-113(c)(2) (2005). Because the decision to terminate parental rights involves fundamental constitutional rights, both of the statutory elements must be proven by clear and convincing evidence. T.C.A. § 36-1-113(c) (2005); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Evidence meets the "clear and convincing" standard if it "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence . . . ." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). Considering this heightened standard, we review the underlying specific factual findings *de novo* upon the record, "accompanied by a presumption of the correctness of the finding[s], unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d) (2006); *In re Audrey S.*, 182 S.W.3d at 861 n.26. The aggregate of the facts, proven by a preponderance of the evidence, must amount to clear and convincing evidence of the elements required to terminate the biological parent's parental rights. The trial court's conclusions of law are, of course, reviewed *de novo*, with no presumption of correctness. *In re Copeland*, 43 S.W.3d at 483, 485 (Tenn. Ct. App. 2000).

As to the trial court's evidentiary rulings, those decisions are accorded wide discretion. The trial court's rulings will be reversed on appeal only when there is a showing of an abuse of

discretion. ***Otis v. Cambridge Mut. Fire Ins. Co.***, 850 S.W.2d 439, 442 (Tenn. 1992); ***Davis v. Hall***, 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995).

Father argues first that the Juvenile Court's failure to appoint an attorney to represent him either during the dependency and neglect proceeding or at some other point before the day of the hearing on the motion for a default judgment requires a reversal. He contends that the consequences of not having a lawyer represent him in the dependency and neglect proceedings were apparent from the comments of the trial court in the termination proceedings below:

> Well you have done absolutely nothing for four years. You haven't paid any child support. All you have done is get your self thrown in jail repeatedly. Over and over again. You haven't paid a nickel in support. You haven't come back or made any effort to go back to DCS and make an inquiry. And I'm sure that if you really wanted to find out how to get in touch with the Department of Children's Services, all you had to do was come out here to the court, you've been out here to the court as much as me and the lawyers, and ask, you know, how do I get in touch with my caseworker, how do I–how do I get my–case back on track. Could have walked into court and asked me and the Court would have at least given you some advice about how to go and find out about your son.

Father acknowledges that, regarding this issue, we have previously held that "any violation of appellant's due process rights, and any violation of the Tennessee Rules of Juvenile Procedure that may have occurred at the dependent and neglect proceeding, was fully remedied by the procedural protections provided [appellant] at the termination hearing." ***In re S.Y.***, 121 S.W.3d 358, 366 (Tenn. Ct. App. 2003); ***see also In re Hoover-Crawford***, No. M2000-01655-COA-R3-CV, 2001 WL 846044, at *4 (Tenn. Ct. App. July 27, 2001); ***State v. Williams***, No. 03A01-9810-JV-00341, 1999 WL 775759, at *1 (Tenn. Ct. App. Sept. 15, 1999). Father argues against these prior holdings and asks us to reconsider them.

It is undisputed that the trial court's findings in dependency and neglect proceedings can form the basis for a subsequent petition to terminate parental rights. This is particularly so in cases where the termination petition asserts as a ground for termination Tennessee Code Annotated § 36-1-113(g)(3), known as "persistence of conditions."[4] ***See In re Audrey S.***, 182 S.W.3d at 874. This

---

[4]The statute provides:

> (g) Initiation of termination of parental . . . rights may be based upon any of the following grounds:
>
> . . .
>
> > (3) The child has been removed from the home of the parent . . . by order of a court for a period of six (6) months and:
> > > (A) the conditions that led to the child's removal or other conditions that in all reasonable probability would cause the

(continued...)

ground for termination is generally based on a judicial finding of dependency, neglect or abuse. *Id.* at 874-75. The dependency and neglect proceedings, however, are separate and distinct from the termination proceedings.[5] Of course, not every finding that a child is dependent and neglected results in termination of the biological parent's parental rights. The finding that L.A.J. was dependent and neglected was appealable, prior to the filing of the petition for termination of Father's parental rights. *See* T.C.A. § 37-1-159(a) (2005) ("[A]ny appeal from any final order . . . in [a] . . . dependent and neglect proceeding . . . may be made to the circuit court. . . ."). Such an appeal could have, of course, alleged the failure to appoint counsel as error. Father, however, did not appeal the finding that L.A.J. was dependent and neglected. Rather, his appeal is of the separate proceeding based on the petition to terminate Father's parental rights.

Moreover, Father does not argue that the dependency and neglect findings were erroneous. Rather, he seems to imply that, had he been represented by counsel in the dependency and neglect proceedings, the advice of an attorney would have resulted in Father mending his ways, leaving no basis for a termination petition.[6] This is not a basis upon which we will reconsider our prior rulings that any violation of a parent's due process rights at the dependency and neglect proceeding is remedied by the procedural protections afforded him during the termination proceeding, including the appointment of an attorney. *In re S.Y.*, 121 S.W.3d 358, 366 (Tenn. Ct. App. 2003).[7] We decline to reconsider our prior rulings and find that the failure to appoint counsel for Father in the prior dependency and neglect proceeding is not a basis for setting aside the decision to terminate his parental rights.

---

[4](...continued)
> child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) . . ., still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) . . . in the near future; and
> (C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

T.C.A. § 36-1-113(g)(3) (2005 & Supp. 2007).

[5]The statutes describe three types of hearings in cases where a child is alleged to be dependent, neglected or abused: preliminary hearings; adjudicatory hearings to determine if the allegations of dependency, neglect or abuse are true; and dispositional hearings to determine the proper placement for the child. *See In re Audrey S.*, 182 S.W.3d at 874-75, and statutes cited therein.

[6]Father cannot plausibly argue that, absent the advice of an attorney, he cannot reasonably be expected to know that he should provide a stable home and stable income for L.A.J., remedy barriers to being able to see L.A.J. and maintain a relationship with him, and refrain from periodic arrest and incarceration.

[7]Father seeks to distinguish the facts in this case from the facts in *In re S.Y.*, 121 S.W.3d 358 (Tenn. Ct. App. 2003). We find no distinction in the facts that would change our holding in this appeal.

-7-

Father also argues that, in order to terminate Father's parental rights, the trial court was required to make a separate finding of a risk of substantial harm to L.A.J. if Father's parental rights were not terminated. This argument has been previously rejected by this Court:

> This court has repeatedly recognized that the statutory grounds for termination of parental rights listed in Tenn. Code Ann. § 36-1-113(g) are all examples of parental conduct and situations that render a parent unfit or pose a risk of substantial harm to the welfare of a child.
> . . . [A]s long as the juvenile court has correctly found that at least one of the statutory grounds for termination of parental rights exists, the constitutional requirement of a showing of parental unfitness or a risk of substantial harm to the welfare of a child has been satisfied.

*In re Audrey S.*, 182 S.W.3d at 881-83; *see also In re Marr*, No. M2001-02890-COA-R3-CV, 2003 WL 152640 (Tenn. Ct. App. Jan. 23, 2003), *cert. granted* (May 27, 2003), *cert. dismissed sub nom Osborn v. Marr*, 127 S.W.3d 737 (Tenn. 2004). Thus, a separate and explicit finding of a substantial risk of harm to the child if the parent's rights are not terminated is not required and this argument must be rejected.

Father also maintains that several of the Juvenile Court's evidentiary rulings require reversal. Specifically, Father argues that the Juvenile Court improperly admitted evidence of criminal convictions that were more than ten years old. Based on the record in this case, even assuming that this ruling was erroneous, any error that the Juvenile Court committed in this regard was harmless. "A final judgment from which relief is available . . . shall not be set aside unless . . . error involving a substantial right more probably than not affected the judgment . . . ." Tenn. R. App. P. 36(b) (2006). It is undisputed that Father was in and out of jail several times *within* the ten year period preceding the termination petition. Therefore, even assuming that the Juvenile Court erred in considering the older criminal convictions, such error must be deemed harmless error. *See Blackburn v. Murphy*, 737 S.W.2d 529, 533-34 (Tenn. 1987).

Additionally, Father argues that it was error for the Juvenile Court to allow Crismon to testify about L.A.J.'s out-of-court statements to Crismon regarding L.A.J.'s relationship with Father. The following exchange is the subject of Father's objection:

> Q (BY DCS' ATTORNEY): What does [L.A.J.] say about his father's role in the termination proceedings?
> [FATHER'S ATTORNEY]: Your Honor, I'm going to object as to any hearsay. . . .
> THE COURT: Objection is overruled. In this type of hearing the Court has very wide latitude. He's the child's counselor. Says he meets with him numerous times a week and has known him for years. And the Court believes that he can certainly—he certainly

would take into consideration what the child has said to him and the child's emotional outward behaviors as far as any opinion that he would express regarding the child. The Court just believes he's probably one of the best witnesses that could testify about—about [L.A.J.].

[FATHER'S ATTORNEY]: And, Your Honor, just for the record, could I . . . just make a continued objection?

THE COURT: Ongoing objection is noted. . . .

A (BY CRISMON): I'll be honest—just to be honest with you, when we mentioned his natural father, I bring it up. He has never in, what's going on five months of me being his counselor, he has never brought up his dad. Even when we came to Covington and around familiar surroundings for a foster care review. Everybody that he mentioned was his mom and he wanted to see his grandpa. I think his grandpa used to work at a store or something in town and he was begging me to go see him.

But with regard to his dad he has shown no interest. When I mentioned his mom, he said, does that mean I won't see her again. But in terms of his dad, there was no questioning, no—nothing other than the acknowledgment [that] he heard what I said.

Generally, "[t]he admissibility of evidence is within the discretion of the trial judge and will be overturned only when there is an abuse of discretion." *Rothstein v. Orange Grove Ctr., Inc.*, 60 S.W.3d 807, 811 (Tenn. 2001) (citing *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1993)) (reviewing the trial court's admission of evidence over defendants' non-hearsay objections). However, "[d]iscretionary decisions must take applicable legal principles into account. If the trial court misconstrues or misapplies the law, its discretion lacks the necessary legal foundation and becomes an abuse of discretion." *BIF, A Div. of Gen. Signals Contracts, Inc. v. Serv. Constr. Co., Inc.*, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988). Thus, the trial court's determination of whether a particular statement by a witness is hearsay is a question of law, reviewed *de novo* with no presumption of correctness. *State v. Shiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *see also Russell v. Crutchfield*, 988 S.W.2d 168, 170 (Tenn. Ct. App. 1998). Hearsay is, of course, an out of court statement offered to prove the truth of the matter asserted. Tenn. R. Evid. 801(c) (2007). A statement is defined as "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a) (2007).

In this case, the DCS attorney asked Crismon what L.A.J. had said about his father, obviously seeking to elicit L.A.J.'s out-of-court statement. Father's attorney then objected, arguing that the response to this question would be hearsay. Of course, whether the answer to this question is hearsay

would depend on whether DCS offered the evidence of L.A.J.'s statement to prove the truth of the matter asserted by the declarant, L.A.J.[8]

The trial judge overruled the hearsay objection by Father's counsel. He did not explicitly rule that Crismon's response would not constitute hearsay. Rather, the trial judge appeared to allow Crismon's testimony because he could provide trustworthy insight into L.A.J.'s thoughts and emotional status, regardless of whether it constituted hearsay.[9]

Of course, neither the attorney's question nor the trial judge's ruling is evidence. Crismon's response to the question is the evidence, so we examine Crismon's testimony to determine if it was hearsay and, if so, whether the trial court erred in allowing it.

Crismon testified that L.A.J. never brought up the subject of his father, had "shown no interest" in his father, and in response to Crismon's statement about his father, L.A.J. had no comment "other than the acknowledgement [that] he heard what [Crismon] said." Thus, Crismon's testimony focused on what L.A.J. did *not* say, concluding from L.A.J.'s failure to speak that he had "shown no interest" in Father.

Some commentators take the position that a failure to speak is not hearsay because it is the *absence* of an out-of-court statement rather than an out-of-court statement. "Although common law cases were divided as to the hearsay status of [a failure to speak or act], the evidence is not hearsay . . . because it is not intended as an assertion." **McCormick on Evidence** § 250 (John W. Strong ed., 5th ed. 1999). Tennessee courts, however, have recognized that silence can constitute hearsay if it is intended as an assertion. **Hulsey v. Bush**, 839 S.W.2d 411, 413 (Tenn. Ct. App. 1992) ("In certain situations, silence is an intentional communication and could constitute hearsay."). This can occur when, for example, the silence is in response to a question, statement, or event. **See id.** (holding that one party's action of turning and walking away without saying anything constituted hearsay when it was done in response to another party's statement that he planned to build a garage on the first party's property). Here, nothing in Crismon's testimony indicates that L.A.J.'s silence regarding

---

[8] **See** Neil P. Cohen, et al., **Tennessee Law of Evidence** § 801.2 (3d ed. 1995).

[9] The trial judge did not specify a hearsay exception on which he was relying. His explanation, however, appears to rely on the Residual Exception to the Hearsay Rule set forth in Rule 807 of the Federal Rules of Evidence, which states:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed. R. Evid. 807 (2007). This Residual Exception was not adopted in the Tennessee Rules of Evidence. **See** Tenn. R. Evid. 804-806 (2007).

Father was intended as an assertion; rather, it was an aspect of L.A.J.'s behavior that Crismon observed. Thus, L.A.J.'s failure to speak about Father was not an out-of-court statement and could not be deemed hearsay. Accordingly, the trial court properly overruled the objection of Father's attorney.

Father also challenges the Juvenile Court's finding that L.A.J. had been abandoned under Tennessee Code Annotated § 36-1-102(1)(A). However, abandonment was only one of several grounds for termination that the Juvenile Court found to have been established by clear and convincing evidence. The Court also found a failure to comply with the permanency plan and persistence of the conditions that led to L.A.J.'s removal, pursuant to Tennessee Code Annotated § 36-1-113(g)(2), (3). Father has not appealed the trial court's findings on the other grounds for termination. In order to terminate Father's parental rights, only one of the grounds for termination must be established. *See* T.C.A. § 36-1-113(g) (2005). Therefore, we need not address this argument on appeal.

Finally, Father argues that the evidence does not establish that termination of Father's parental rights was in the best interest of his child because DCS and Coteswood had abandoned efforts to find an adoptive home in light of L.A.J.'s violent outbursts. The record, however, does not support Father's assertion. Crismon, a supervisor at Coteswood, and Jerrod Gunther testified that finding an adoptive home for L.A.J. would be more difficult than finding one for a child with fewer emotional and behavioral issues and acknowledged that adoption was not viable at the time of trial. However, their testimony did not indicate that they had abandoned the possibility of adoption.[10] In fact, there was some testimony that the termination of Father's parental rights could improve the possibility of L.A.J.'s adoption by removing a legal impediment that a possible adoptive parent would otherwise have to address. Moreover, the record clearly shows that Father has utterly failed to change his circumstances or conduct in order to make it safe for L.A.J. to return to his care. *See* T.C.A. § 36-1-113(i)(1) (2005). At the time of trial, Father did not have a steady job or a stable home, was under house arrest for an assault conviction, and was facing further criminal charges for public intoxication and theft. Further, Father had never addressed his consistent use of alcohol and/or other controlled substances and had failed to provide L.A.J. with any financial support whatsoever. *See* T.C.A. § 36-1-113(i)(7), (9) (2005). We find no error in the Juvenile Court's finding that termination of Father's parental rights was in L.A.J.'s best interests.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Larry A. Jones, Jr., for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[10]Moreover, the termination statute does not require proof that an adoptive family stands ready to adopt the child at issue. *See* T.C.A. § 36-1-113(d)(3)(C)(i), (h)(1) (2005); *see also In re Audrey S.*, 182 S.W.3d 838, 879-80 (Tenn. Ct. App. 2005).