IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 12, 2025

## JAMES B. JOHNSON v. BOARD OF PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF TENNESSEE

**Direct Appeal from the Circuit Court for Davidson County**
No. 23C-1171        Robert E. Lee Davies, Senior Judge

———————————————————

**No. M2024-00452-SC-R3-BP**

———————————————————

A hearing panel of the Board of Professional Responsibility found that James B. Johnson violated Rules 1.6, 1.16, and 8.4(a) and (d) of the Tennessee Rules of Professional Conduct when he publicly filed confidential communications between him and his client as an exhibit to a motion to withdraw. The panel suspended him from the practice of law for three months with thirty days as an active suspension and imposed additional continuing legal education requirements. Finding no abuse of discretion, we affirm.

**Tenn. Sup. Ct. R. 9, § 33.1(d); Judgment of the Circuit Court Affirmed**

DWIGHT E. TARWATER, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and HOLLY KIRBY, SARAH K. CAMPBELL, and MARY L. WAGNER, JJ., joined.

James Broderick Johnson, Nashville, Tennessee, Pro Se.

James W. Milam, Brentwood, Tennessee, for the appellee, Board of Professional Responsibility.

## OPINION

### I. FACTUAL & PROCEDURAL BACKGROUND

On March 11, 2021, the Board of Professional Responsibility of the Supreme Court of Tennessee ("the Board") received a complaint regarding attorney James B. Johnson from his client, Janee Howard. She alleged that Mr. Johnson's actions during the representation had caused her harm and that he "quit . . . before a life changing date in [her] case." While not specifically raised by Ms. Howard in her complaint, it was *how* Mr. Johnson attempted to "quit" her case that ultimately landed him before this Court.

Mr. Johnson and Ms. Howard met in early January 2021. Over the next few weeks, Mr. Johnson began to assist with her ongoing divorce proceedings in Shelby County Circuit Court, including appearing on her behalf in court and negotiating with opposing counsel. On February 2, 2021, Mr. Johnson and Ms. Howard signed an engagement letter which formalized the attorney client relationship. Specifically, the two agreed that Mr. Johnson would negotiate "a settlement of [her] divorce and parenting issues for a flat fee of $3,500.00 . . . to be paid" from the sale of Ms. Howard's home. Even before, and surely after, the engagement letter was signed, the two had disagreements about the scope and strategy of the representation. These disagreements included arguments in Mr. Johnson's office and contentious emails between the two. For example, an email from Mr. Johnson sent one day after the engagement letter was signed read:

> I have decided that I am not going to prepare the MDA and Parenting Plan to be signed this week because of your awful attitude and the disrespect you exhibited towards me yesterday. Not only were you blatantly disrespectful, but you have failed to show any remorse for your behavior. When you decide to sincerely apologize for your behavior, then we may resume the attorney-client relationship. However, I am in no way compelled to do any more work for you until you show some respect and contrition. Until that happens, your closing of the property will lie dormant and so will the MDA and Parenting Plan. Finally, if you decide not to apologize and agree to curtail your behavior, I will gladly terminate the attorney-client relationship and you can pay me for the services rendered up to this point. You will then be free to retain another attorney to handle this matter for you. But[] I will not tolerate the type of behavior and disrespect that you displayed in my office yesterday.

Ms. Howard dutifully apologized by email but reiterated that she believed Mr. Johnson had revealed confidential information to her husband. Afterwards, the relationship continued to sour. On February 27, 2021, Mr. Johnson emailed Ms. Howard a summary of her specific, substantive positions on matters in the litigation and stated that she had "gone too far and [he would] not tolerate" her dissatisfaction with his services.

Mr. Johnson ultimately filed a "Motion to Withdrawal [sic] and Motion for Award of Attorneys' Fees" on March 16, 2021.[1] In the motion, Mr. Johnson stated that he had notified Ms. Howard of his intention to withdraw and had unsuccessfully attempted to get her approval to do so. He asked the trial court to order Ms. Howard to pay him $3,500.00 as specified in the engagement letter, which he attached in complete and unredacted form.

---

[1] Mr. Johnson filed a Notice of Appearance in the case on March 17, 2021, the day after moving to withdraw.

He further argued that after providing all agreed-upon services, Ms. Howard "refused to follow the advice of counsel," and "began to berate Mr. Johnson through written emails, thereby causing Mr. Johnson to terminate the relationship."

In support of his motion and without the informed consent of his client, Mr. Johnson attached a collective exhibit of unredacted emails between him and Ms. Howard, including those discussed *supra*. The emails contained discussion of the scope of the relationship, Mr. Johnson's professional opinions and advice related to the representation, Ms. Howard's position on matters at issue in the case, threats by Mr. Johnson to withhold services as punishment for what he perceived as poor behavior by his client, and personal insults between the two. There is no dispute that these are confidential communications disclosed in a public filing. On March 30, 2021, the trial court, seemingly oblivious to the improper disclosures, granted the motion to withdraw, denied the motion for attorneys' fees, and stated that Mr. Johnson was permitted to file an attorney's lien for his fees.

After Ms. Howard supplemented her submission at the Board's request, Mr. Johnson was first notified of the complaint on April 13, 2021. After multiple missed deadlines, Mr. Johnson finally responded to the complaint on June 4, arguing that he had provided professional and competent representation and that Ms. Howard's behavior caused him to terminate the relationship.

The Board filed its Petition for Discipline against Mr. Johnson on January 28, 2022, after Mr. Johnson rejected a public censure and demanded a formal proceeding. The Board's petition was focused on the undeniable confidentiality of the disclosed emails in support of Mr. Johnson's motion to withdraw.

After a hearing on December 14, 2022, the hearing panel determined that Mr. Johnson violated Rules 1.6, 1.16, and 8.4(a) and (d) of the Tennessee Rules of Professional Conduct. Rule 1.6 forbids an attorney from revealing confidential information related to the representation without a client's informed consent. Tenn. Sup. Ct. R. 8, RPC 1.6. The rule provides for a few exceptions, though the hearing panel did not find any of them applicable here. Rule 1.16 governs when an attorney may or must withdraw from representation of a client, but it also requires the attorney to take reasonable steps to protect the client's interests. Tenn. Sup. Ct. R. 8, RPC 1.16. Finally, Rule 8.4 is a general provision stating that it is professional misconduct for an attorney to violate or attempt to violate the Rules of Professional Conduct or to "engage in conduct that is prejudicial to the administration of justice." Tenn. Sup. Ct. R. 8, RPC 8.4.

The hearing panel then found the following American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards") were applicable: 1.1, 3.0, 4.22. ABA Standards 1.1 and 3.0 are general provisions stating respectively that "[t]he purpose of

lawyer discipline proceedings is to protect the public and the administration of justice" and that a court "imposing a sanction after a finding of lawyer misconduct . . . should consider" certain factors, including "the duty violated[,]" "the lawyer's mental state[,]" "the potential or actual injury caused by the lawyer's misconduct[,]" and "the existence of aggravating or mitigating factors." ABA Standard 4.22 then provides that "[s]uspension is generally appropriate when a lawyer knowingly reveals information relating to the representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client."

In considering the requirements of Standard 3.0, the hearing panel noted that "the duty [of confidentiality] violated was among the most fundamental owed by attorneys . . . to clients." The hearing panel found it to be a "[c]ritical" fact that the "duty . . . was intentionally violated" by Mr. Johnson, as he "knowingly attached the confidential communications at issue as an exhibit in support of his motion for withdrawal and fees." As support for this finding, the hearing panel found that Mr. Johnson's actions showed a lack of respect to his client, as evidenced by the "resentment and spite shown" in the attached emails suggesting that Mr. Johnson filed them publicly in retaliation against his client.

The hearing panel then considered the application of aggravating and mitigating factors.[2] It found three aggravating factors to be relevant: Mr. Johnson's prior disciplinary offenses, his refusal to acknowledge the wrongful nature of his conduct, and his substantial experience in the law.[3] Mr. Johnson had two prior disciplinary offenses: a public censure in 2019 and a private informal admonition in 2022. The hearing panel also found that Mr. Johnson did not acknowledge the wrongful nature of his conduct until the date of the hearing, though he still continued to claim "that his overall conduct was appropriate and professional." The hearing panel additionally took note of the substantial amount of time that Mr. Johnson has been an attorney, having been licensed since 1992. It declined to apply any mitigating factors.

Noting that there was no showing of actual injury, the hearing panel found that the Board had established a showing of potential injury, however, including that the trial court could have formed an unfavorable opinion of Ms. Howard or that her husband could have gained a tactical advantage in the divorce proceedings. Likening the revelation of confidential client communications to opening Pandora's Box, the hearing panel noted that the potential harm was unpredictable and broad.

---

[2] ABA Standards 9.21 (defining aggravating circumstances), 9.22 (listing aggravating factors), 9.31 (defining mitigating circumstances), and 9.32 (listing mitigating factors).

[3] ABA Standards 9.22(a), (g), and (i), respectively.

- 4 -

After considering its findings, the hearing panel suspended Mr. Johnson from the practice of law for three months, with a one-month active suspension and two months of probation. It further required Mr. Johnson to complete six additional hours of continuing legal education "related to client relations, the management of a law practice, and/or Rules of Professional Conduct" by the end of his three-month suspension.

Hearing panel member Christopher C. Sabis fully joined the majority and filed a concurring opinion. In his separate opinion, Mr. Sabis explained that the Board and Mr. Johnson were mistaken when they agreed that Mr. Johnson could have avoided a violation of Rule 1.6 had he filed the emails under seal or for the court's eyes only. As correctly noted by Mr. Sabis, "[a] disclosure of confidential information to a judge is still a disclosure of confidential information."[4]

Mr. Johnson filed a Petition for Review in the Davidson County Circuit Court arguing that the hearing panel's judgment should be vacated, reversed, or modified as its decisions were arbitrary and capricious and unsupported by substantial and material evidence. The trial court first noted that Mr. Johnson's excuse for his violation of Rule 1.6—that he did not understand the extent to which it protected confidential client information—was meritless. It explained that attorneys licensed in this state are required to understand the Rules of Professional Conduct, and his ignorance of Rule 1.6 did not override the fact that he intentionally published his client's confidential information. However, the trial court agreed with Mr. Johnson that a subsequent motion filed in Ms. Howard's case—introduced as "Exhibit 5" during the disciplinary hearing—should have been excluded as a subsequent remedial measure under Tennessee Rule of Evidence 407, finding that it was "used by the Board to argue culpable conduct." Exhibit 5 was a motion filed "For the Court's Eyes Only" in support of Mr. Johnson's efforts to establish an attorney's lien on Ms. Howard's property. The trial court did not explain why it believed that Exhibit 5 was a subsequent remedial measure under Rule 407.[5] While finding that Exhibit 5 may have hindered Mr. Johnson's efforts to express remorse, the trial court ultimately held that the hearing panel did not appear to have been overly influenced by Exhibit 5 when it decided to apply ABA Standard 4.22.

The trial court also held that the mitigating factor of cooperation should have been applied, as the hearing panel's reliance on the relevant facts did "not justify its failure to find this mitigating factor in favor of Mr. Johnson."

---

[4] *See* discussion of Exhibit 5 *infra*.

[5] Exhibit 5 was not a subsequent remedial measure and was properly admitted. *See infra*.

The trial court concluded that the hearing panel's decision was supported by the record, and that any change in Mr. Johnson's sanction "would be de minim[i]s" since he received "the minimum active suspension required"[6] after applying ABA Standard 4.22. The trial court therefore affirmed the hearing panel's decision.

Mr. Johnson filed a notice of appeal to this Court.

## II. STANDARD OF REVIEW

This Court is vested with the "inherent supervisory power to regulate the practice of law." *Brown v. Bd. of Pro. Resp.*, 29 S.W.3d 445, 449 (Tenn. 2000) (quoting *In re Burson*, 909 S.W.2d 768, 773 (Tenn. 1995)). "[W]e are tasked with the ultimate disciplinary responsibility for violations of the ethical rules that govern the legal profession . . . ." *Waggoner v. Bd. of Pro. Resp.*, 673 S.W.3d 227, 234–35 (Tenn. 2023) (quotation marks omitted) (quoting *Sneed v. Bd. of Pro. Resp.*, 301 S.W.3d 603, 612 (Tenn. 2010)).

The Court does not "substitute its judgment for that of the hearing panel on questions of fact." *Bd. of Pro. Resp. v. Prewitt*, 647 S.W.3d 357, 366 (Tenn. 2022) (citing *Napolitano v. Bd. of Pro. Resp.*, 535 S.W.3d 481, 496 (Tenn. 2017)). The Court may only reverse or modify any findings of the hearing panel and trial court if such findings were:

> (1) in violation of constitutional or statutory provisions; (2) in excess of the hearing panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Sup. Ct. R. 9, § 33.1(b); *see also Bd. of Pro. Resp. v. Love*, 256 S.W.3d 644, 653 (Tenn. 2008); *Hoover v. Bd. of Pro. Resp.*, 395 S.W.3d 95, 103 (Tenn. 2012). An abuse of discretion occurs when a tribunal "appl[ies] an incorrect legal standard or reach[es] a decision that is against logic or reasoning that causes an injustice." *Bd. of Pro. Resp. v. Parrish*, 556 S.W.3d 153, 163 (Tenn. 2018) (alteration in original) (quoting *Sallee v. Bd. of Pro. Resp.*, 469 S.W.3d 18, 42 (Tenn. 2015)). "An arbitrary [or capricious] decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Hughes v. Bd. of Pro. Resp.*, 259 S.W.3d 631, 641 (Tenn. 2008) (alteration in original) (quoting *Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 106, 111 (Tenn. Ct. App. 1993)). "[A] decision not

---

[6] "A suspension order must result in some cessation of the practice of law for not less than thirty days." Tenn. Sup. Ct. R. 9, § 12.2(a).

supported by substantial and material evidence qualifies as arbitrary and capricious." *Bd. of Pro. Resp. v. Allison*, 284 S.W.3d 316, 322 (Tenn. 2009). Substantial and material evidence is that which "a rational mind might accept to support a rational conclusion" and "will be sufficient if it furnishes a reasonably sound factual basis for the decision being reviewed." *Id.* (quoting *City of Memphis v. Civ. Serv. Comm'n of Memphis*, 216 S.W.3d 311, 316–17 (Tenn. 2007)). Substantial and material evidence "has also been described as requiring 'something less than a preponderance of the evidence . . . but more than a scintilla or glimmer.'" *Id.* (quoting *Jones v. Bureau of TennCare*, 94 S.W.3d 495, 501 (Tenn. Ct. App. 2002)).

## III. ANALYSIS

Mr. Johnson does not dispute that he violated the Rules of Professional Conduct. Rather, he argues that his sanction was too harsh. Mr. Johnson specifically challenges: (1) the determination that his actions were "knowing," as opposed to negligent, such that ABA Standard 4.22 applied and whether the admission of Exhibit 5 contributed to that finding; (2) the hearing panel's application of an aggravating factor based on his refusal to acknowledge the wrongful nature of his conduct; (3) the hearing panel's failure to apply a mitigating factor related to his cooperation with the Board; and (4) the severity of his sanction when compared to other cases. We will address each in turn.

### ABA Standards

"[A] hearing panel shall consider the applicable ABA Standards when determining the proper discipline for attorney misconduct." Tenn. Sup. Ct. R. 9, § 15.4(a); *accord Bd. of Pro. Resp. v. Sheppard*, 556 S.W.3d 139, 147 (Tenn. 2018). These standards serve as guidelines rather than "rigid rules that dictate a particular outcome." *Hyman v. Bd. of Pro. Resp.*, 437 S.W.3d 435, 447 (Tenn. 2014). "The Standards recommend the *type* of sanction—such as disbarment or suspension—that the ABA Sanctions Committee deems generally appropriate for various kinds of misconduct." *Bd. of Pro. Resp. v. Cowan*, 388 S.W.3d 264, 268 (Tenn. 2012). The ABA model considers "the duty violated, the attorney's mental state, and any actual or potential injury." *Id.* "[T]he severity of the presumptive sanction varies depending upon the lawyer's mental state—whether the lawyer acted intentionally, knowingly, or negligently—and the seriousness of the actual or potential injury caused by the lawyer's misconduct." *Maddux v. Bd. of Pro. Resp.*, 409 S.W.3d 613, 624 (Tenn. 2013). The ABA standards define these terms. *Id.* An act is done knowingly if it is accomplished with "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards, Definitions. On the other hand, an attorney's violation is deemed negligent where he or she failed "to heed a substantial risk that circumstances exist or that a result will follow," and that his or her "failure is a deviation

from the standard of care that a reasonable lawyer would exercise in the situation." *Id.* Potential injury includes harm to a client "that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." *Id.*

"Once a presumptive sanction is determined, Standard 9 then provides that a greater or lesser sanction may be appropriate due to the existence of aggravating or mitigating factors." *Cowan*, 388 S.W.3d at 268; ABA Standard 9.0. "Thus, any analysis of the proper discipline involves two steps: first, [to] identify the presumptively appropriate sanction applicable to the established misconduct, and then [to] consider whether that sanction should be increased or decreased due to aggravating and mitigating circumstances, if any." *Cowan*, 388 S.W.3d at 268.

Mr. Johnson argues that his actions were negligent rather than knowing and thus the hearing panel erred in applying Standard 4.22—which provides for suspension as the presumptive sanction for knowing conduct—rather than Standard 4.23—which provides for public reprimand as the presumptive sanction for negligent conduct. Seemingly, Mr. Johnson argues that he only negligently violated Rule 1.6 when he attached the confidential communications to his motion because he either: (1) incorrectly believed that Rule 1.16 required him to show the communications as justification for his withdrawal; and/or (2) believed that Rule 1.6(b)(5)[7] provided an applicable exception for establishing a claim or defense against Ms. Howard. Respectfully, he appears to be conflating whether he knowingly violated Rule 1.6 with whether he "knowingly reveal[ed] information relating to the representation of a client" as described in Standard 4.22. Regardless, the hearing panel found that Mr. Johnson "intentionally violated" his "duty of confidentiality" when he "knowingly attached the confidential communications" to the motion. It further found that there was a showing of potential injury to Ms. Howard and applied ABA Standard 4.22 calling for suspension as the presumptive sanction for this "knowing[]" action.

Mr. Johnson's arguments that Standard 4.23 "could have" applied are misguided and unpersuasive. Mr. Johnson is mistaken that his ignorance of the Rules of Professional Conduct means that his actions were inherently negligent as opposed to knowing. He deliberately attached confidential emails to and from his client without her consent to a publicly filed motion to withdraw. The emails were not filed by accident, nor did he mistakenly believe he had his client's consent. Rather, he disclosed what he knew were confidential communications relating to the representation of his client.

---

[7] Rule 1.6(b)(5) provides: "(b) A lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary: . . . (5) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client . . . ." Tenn. Sup. Ct. R. 8, RPC 1.6.

That he incorrectly believed Rule 1.16 required him to disclose the information as grounds for withdrawal is no defense. *See In re Bowen*, 252 A.3d 300, 311 (Vt. 2021) ("[Attorney's] mistaken belief that the disclosure was appropriate under the rules does nothing to change the fact that he knowingly disclosed the information."); *In re Cross*, 500 P.3d 958, 960 (Wash. 2021) (en banc) ("[A] lawyer's conscious choice to disclose client information that the RPCs protect from disclosure constitutes 'knowing,' rather than 'negligent,' conduct—even if the lawyer does not know that the RPCs protect that information."); *cf. Moore v. Lawrence Cnty.*, 230 S.W.2d 666, 668 (Tenn. 1950) (holding that ignorance of the law is no defense). Rule 1.16 merely explains the grounds for when an attorney must or may withdraw from representation; it does not state that an attorney can disclose such justifications publicly in violation of other Rules of Professional Conduct. *See* Tenn. Sup. Ct. R. 8, RPC 1.16. In fact, Rule 1.16(c) specifically states that "[a] lawyer must comply with applicable law requiring notice to or permission of a tribunal when terminating a representation." Tenn. Sup. Ct. R. 8, RPC 1.16(c). The "applicable law" includes Rule 1.6. Mr. Johnson's misunderstanding of Rule 1.16 does not entitle him to a lesser sanction for his violation of Rule 1.6.

Further, the hearing panel was correct to reject his argument that Rule 1.6(b)(5) provided a relevant exception to the disclosures in this matter. It is not lost on this Court that Mr. Johnson's claimed motivation for moving to withdraw (concern that Ms. Howard may refuse to pay his fees) is suspect. The engagement letter stated that Ms. Howard would pay Mr. Johnson with funds from the sale of a particular piece of real property. When the motion to withdraw was filed, nothing in the record suggests that the property had been sold, and it does not appear that Ms. Howard ever threatened to withhold payment. Rather, he argued in the motion that Ms. Howard "refused to follow the advice of counsel, began to berate Mr. Johnson through written emails, [and] thereby caus[ed] Mr. Johnson to terminate the relationship," which he supported with the attachment of a collective exhibit of confidential emails. And in his initial response to the Board regarding Ms. Howard's complaint, he stated that he "decided to terminate the relationship" because he "would not accept" her "derogatory lace of attacks upon [him]." Yet in front of the hearing panel, Mr. Johnson's argument became that he "reasonably believed that [Ms. Howard] was not going to pay [him]" and attached the emails to show that he "actually did the work and had earned the fees." Thus, Mr. Johnson's argument that he believed Rule 1.6(b)(5) empowered him to disclose confidential information to support his claim for attorneys' fees—and that this belief suggests that the wrong ABA Standard was applied to his actions—is unconvincing. Substantial and material evidence supported the hearing panel's decision to reject it.

It is generally improper for a hearing panel to rely upon an attorney's motive, as opposed to his or her mental state, for purposes of determining the presumptive sanction. *See, e.g.*, *In re Att'y D.*, 57 P.3d 395, 400 (Colo. 2002) (en banc) (distinguishing between "mental state" in Standard 3.0 and "motivation" in Standard 9.32(b)). However, the

hearing panel's order makes clear that its selection of the presumptive sanction was based on a "knowing" state of mind based on the circumstances surrounding the disclosure, rather than on Mr. Johnson's motive. Knowledge may be inferred from appropriate circumstances. Tenn. Sup. Ct. R. 8, RPC 1.0(f). We find no error in the hearing panel's analysis of the circumstances of Mr. Johnson's actions here to support its determination of his mental state.

Regardless of his motivations for filing, the disclosure of confidential communications in Mr. Johnson's motion to withdraw was unjustifiable. There was substantial and material evidence to support the application of Standard 4.22 to Mr. Johnson's rules violations, and the hearing panel therefore did not act arbitrarily or capriciously.

*Exhibit 5*

In support of his argument that his actions were merely negligent and not knowing, Mr. Johnson argues that Exhibit 5, the motion filed "For the Court's Eyes Only," should not have been admitted because it was a subsequent remedial measure under Tenn. R. Evid. 407. This rule provides, in relevant part: "When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent remedial measures is not admissible to prove strict liability, negligence, or culpable conduct in connection with the event." Tenn. R. Evid. 407.

The Board offered Exhibit 5 as proof that Mr. Johnson knew how to protect confidential client communications. Of course, Exhibit 5 is proof of no such thing. As the concurring opinion pointed out, disclosure of confidential information to a judge is still disclosure of confidential information. *See In re Vogel*, 482 S.W.3d 520, 531–32 (Tenn. 2016) (finding an attorney violated Rule 1.6 by disclosing confidential information to a judge).

The trial court noted that it "appeared likely" that Exhibit 5 "may have affected" the hearing panel's finding that Mr. Johnson refused to acknowledge the wrongful nature of his conduct. Nevertheless, the trial court held that the hearing panel did not appear to have been influenced by Exhibit 5 when it decided to apply ABA Standard 4.22. Mr. Johnson argues that the hearing panel acted arbitrarily and capriciously by admitting Exhibit 5. Had it not done so, he argues that the hearing panel and trial court "could have" found he violated Rule 1.6 negligently, not knowingly, entitling him to a lesser presumptive sanction.

To be clear, Exhibit 5 is not evidence of a subsequent remedial measure. It was not filed "to prevent the situation from causing further injury." *See Rothstein v. Orange Grove*

*Ctr., Inc.*, 60 S.W.3d 807, 813 (Tenn. 2001). It was filed by Mr. Johnson to collect his fee. It did not remedy anything. Rather, it made things worse. Nevertheless, the trial court ultimately held that the hearing panel did not appear to have been overly influenced by Exhibit 5 when it decided to apply ABA Standard 4.22. And, as the trial court pointed out, the hearing panel "gave Mr. Johnson about the lightest sanction it could." Therefore, the hearing panel's admission of Exhibit 5 was neither arbitrary or capricious, nor was its limited reliance upon that evidence to support the application of ABA Standard 4.22 misplaced.

*Mitigating Factor of Cooperation*

Mr. Johnson next argues that his cooperation warranted the application of the mitigating factor found in ABA Standard 9.32(e).[8] He contends that there was no evidence to support the hearing panel's finding that the Board had difficulty contacting him during the proceedings, a point on which the trial court agreed. However, Mr. Johnson argues that the trial court then erred by finding that despite the fact that it disagreed with the hearing panel in not applying this mitigating factor, it could not reduce his sanction. Mr. Johnson contends that the hearing panel's reliance "upon non-existent evidence," along with the introduction of Exhibit 5, "shows that the [hearing] [p]anel acted arbitrarily and capriciously."

The application of this mitigating factor traditionally requires a finding that an attorney went above and beyond in cooperating with the Board. *See, e.g.*, *In re Disciplinary Proc. Against Trejo*, 185 P.3d 1160, 1176 (Wash. 2008) (en banc) (applying mitigating factor based on cooperation of attorney who volunteered additional information of his violations outside the scope requested by the state bar); *In re Mann*, 853 P.2d 1115, 1119 n.12 (Alaska 1993) (applying mitigating factor based on attorney voluntarily turning himself in for violations which could have gone undiscovered without his disclosure). And even then, it should typically be afforded little weight, as attorneys have a duty to cooperate with disciplinary authorities. *See* Tenn. Sup. Ct. R. 9, § 1 (Preamble).

As an initial matter, we agree with Mr. Johnson that the record did not support the hearing panel's finding that he failed to keep an active mailing address on file with the Board. He apparently did not live at the address on file, but he testified that he retrieved his mail from the house. In fact, the only communication from the Board that he allegedly never received was a private admonition in a separate matter. No other salient facts about his mailing address, other than it was the home of his ex-wife, appear in the record. Thus,

---

[8] "[F]ull and free disclosure to disciplinary board or cooperative attitude toward proceedings." ABA Standard 9.32(e).

there was not substantial or material evidence to support the hearing panel's finding that Mr. Johnson's mailing address caused any real contact issues with him.

However, the hearing panel relied on additional evidence in declining to apply this mitigating factor. It found that Mr. Johnson was "not as diligent as he could have been in ensuring that [the Board] could contact him during this important matter," and that he raised certain objections late. The hearing panel's findings of fact lend significant support to this determination. The Board sent Mr. Johnson a copy of Ms. Howard's complaint by email on April 13, 2021, and requested a response within ten days. On May 6, 2021, the Board sent additional information to Mr. Johnson and requested a response within seven days. Mr. Johnson did not respond to the Board until May 18, 2021, thirty-five days after the initial communication and twelve days after the follow-up. In his response, he stated he would need until May 25, 2021, to provide a written response. On June 4, 2021, ten days after his personally requested deadline and fifty-two days after the Board's initial communication, Mr. Johnson finally provided his written response. Clearly, there was substantial and material evidence to support the hearing panel's finding that Mr. Johnson could have been more diligent in his communications with the Board.

There is also substantial and material evidence to support the hearing panel's finding that Mr. Johnson raised certain objections late. A scheduling order was entered by the hearing panel on April 7, 2022, setting forth various filing deadlines and a hearing date of September 20, 2022. Included in this order was an August 17, 2022 deadline for all motions *in limine*. On September 6, 2022, the Board served its witness list, which reserved the right to call Ms. Howard as a "[p]otential rebuttal witness." On the same day, Mr. Johnson served his own witness list, which also included Ms. Howard. The day before the scheduled hearing and after all deadlines in the scheduling order had run, the hearing panel continued the hearing until October 17. During an October 7 hearing conducted upon Mr. Johnson's informal request, he moved to exclude Ms. Howard as a rebuttal witness for the Board because he had been unable to serve her with a subpoena compelling her testimony in his case in chief. The hearing panel denied the motion but ordered a second continuance to provide Mr. Johnson with additional time to properly serve Ms. Howard. On November 18, Mr. Johnson once again moved to strike Ms. Howard as a rebuttal witness for the Board after trying and failing to serve her with a subpoena. The hearing panel denied the motion and found that despite having all relevant materials regarding the Board's allegations for months, he "delayed in deciding" to call her as a witness in his case-in-chief. He waited until after the original hearing date had passed to raise the issue for the first time and was given additional time to complete service upon her—which he failed to do. Upon review of this record, we conclude that substantial and material evidence supports the hearing panel's decision to reject the mitigating factor found in Standard 9.32(e).

Therefore, the hearing panel did not act arbitrarily or capriciously when it declined to apply this mitigating factor.

*Aggravating Factors*

Mr. Johnson also disagreed with the hearing panel's application of an aggravating factor based on his failure to acknowledge the wrongfulness of his conduct. It is true that this factor should not be applied where an attorney is merely mounting a defense. *Bd. of Pro. Resp. v. Daniel*, 549 S.W.3d 90, 104 (Tenn. 2018). Generally, however, the application of this factor is upheld as a matter of law where the facts are undisputed and the lawyer refused to acknowledge the wrongfulness of his or her conduct. *See, e.g.*, *Fla. Bar v. Germain*, 957 So. 2d 613, 622 (Fla. 2007) (per curiam) (approving application of aggravating factor under Standard 9.22(g) when lawyer stipulated to most of the facts, did not dispute that he engaged in misconduct including lying under oath, yet continued to assert that his actions did not constitute unethical conduct); *Att'y Grievance Comm'n v. Mininsohn*, 846 A.2d 353, 376 (Md. 2004) (upholding aggravating factor because the lawyer exhibited "a certain callousness toward his situation" and a "reluctance to accept responsibility for his actions").

It is a close question whether Mr. Johnson acknowledged the wrongfulness of his conduct before the hearing panel and trial court. On one hand, the trial court found him to be "remorseful to the point of being sorrowful regarding his conduct."[9] On the other hand, however, central arguments in his defense in front of the hearing panel involved the incorrect notion that his violation could have been avoided had he simply filed the confidential information under seal. We do not doubt that Mr. Johnson regrets his actions, but the hearing panel's decision on this factor was supported by substantial and material evidence in the record, and we will not substitute our judgment simply because reasonable minds could disagree on this issue. *Sallee*, 469 S.W.3d at 42 (stating that under the abuse of discretion standard, a hearing panel's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made") (quoting *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000)).

*Uniformity of Punishment*

Mr. Johnson next argues that his suspension was overly harsh when compared to other similar disciplinary cases. "In deciding an appropriate sanction when an attorney is found to have breached the rules governing his or her profession, we are required to review

---

[9] We do note, however, that this factor involves acknowledging wrongfulness, not merely expressing remorse.

all of the circumstances of the particular case and also, for the sake of uniformity, sanctions imposed in other cases presenting similar circumstances." *Allison*, 284 S.W.3d at 327.

Mr. Johnson cites three cases from the District of Columbia Court of Appeals and urges this Court to find his suspension "too severe" in comparison. We decline to do so. The cases cited by Mr. Johnson involve that court applying various jurisdictions' rules to disparate facts. *In re Gonzalez*, 773 A.2d 1026, 1027 (D.C. 2001) (applying Virginia law where the state board sought only private admonition); *In re Ponds*, 876 A.2d 636, 636–37 (D.C. 2005) (per curiam) (applying Maryland law where neither party opposed a public censure); *In re Osemene*, 277 A.3d 1271, 1271 (D.C. 2022) (applying District of Columbia law where neither party objected to the recommended public censure). Mr. Johnson also cites a public censure filed against a Washington County attorney in 2021 where the attorney disclosed confidential information when responding to a former client's negative online review of his services. *Release of Information*, Bd. of Pro. Resp. of the Sup. Ct. of Tennessee (Apr. 8, 2021), https://docs.tbpr.org/johnson-64942.pdf. The limited facts of that case are significantly different than this matter, and that attorney was only found to have violated a single, different Rule of Professional Conduct: 1.9(c) (duties to former clients). *See id.*

Frankly, there are few disciplinary decisions in this state regarding disclosures of confidential information,[10] and none of them are "sufficiently similar to the case before us to serve as direct precedent for the punishment in this case." *Vogel*, 482 S.W.3d at 542. Tennessee and other jurisdictions have imposed a variety of sanctions for violations of Rule 1.6,[11] which suggests "that no one punishment is necessarily more appropriate than any other in these types of cases." *Id.* at 544.

Two decisions from this Court are somewhat instructive but both have significant factual differences justifying harsher or lesser sanctions. First, in *Vogel*, an attorney was placed on active suspension for a year for violations of Rules 1.7, 1.9, and 8.4 based on two separate complaints. 482 S.W.3d at 522–33. In the relevant complaint, the attorney had filed a motion to withdraw from representation in a criminal matter which stated that he could not disclose the nature of the conflict of interest without violating attorney-client confidentiality. *Id.* at 522. The trial court granted the motion, but the judge later instructed

---

[10] Probably because client confidentiality is a bedrock principle that all attorneys realize they must preserve and protect.

[11] *See, e.g.*, *Matter of Breault*, 913 S.E.2d 691, 699–700 (Ga. 2025) (ordering a six-month suspension); *Bd. of Pro. Resp. v. Austin*, 538 P.3d 653, 656 (Wyo. 2023) (upholding a sixty-day suspension); *In re Disciplinary Action Against Dyer*, 817 N.W.2d 351, 363 (N.D. 2012) (ordering a nine-month suspension); *In re Lyle*, 74 A.3d 654 (Del. 2013), *reinstatement granted*, 86 A.3d 1119 (Del. 2014) (unpublished table decision) (upholding public reprimand and six-month suspension).

the attorney to send his former client an explanation after she had requested further information for why the attorney had withdrawn. *Id.* The attorney obliged, sending a letter which explained his withdrawal, divulged confidential information related to the representation, and "contained assertions that cast [the client] in a negative light." *Id.* at 522–23. For whatever reason, the attorney sent a copy of this letter to the judge—who was still assigned to the case at that point. *Id.* at 523. Ultimately, the attorney was found to have violated Rules 1.9 and 8.4 related to this disclosure of confidential client information. *Id.* at 522–24. The attorney had also engaged in an inappropriate sexual relationship with a client in violation of Rules 1.7(a)(2) and 8.4(a). *Id.* at 524–29. While the hearing panel initially imposed a twelve-month suspension with only thirty days active, this Court found that punishment inadequate and ultimately imposed a twelve-month active suspension. *Id.* at 544.

More recently in *Slaughter v. Board of Professional Responsibility of the Supreme Court of Tennessee*, this Court upheld a hearing panel's decision to impose a public censure on an attorney for violating Rules 1.6 and 8.4. 706 S.W.3d 326, 329 (Tenn. 2025). In that matter, an attorney had a meeting with a client, another party, and that other party's counsel. *Id.* During that meeting, Mr. Slaughter expressed concerns about a prior case he had worked on and the other attorney's connection to it, revealing confidential information about that case and the parties involved, including a juvenile victim. *Id.* The other attorney ended the meeting and reported the behavior to the Board. *Id.* Mr. Slaughter argued at different points that the information was either not confidential or that he had his client's consent, both of which the Board and hearing panel rejected. *Id.* at 329–30. Ultimately, this Court overturned a finding that the attorney had violated Rule 4.4(a)(1) but upheld the hearing panel's decision to impose a public censure for a violation of Rule 1.6(a). *Id.* at 334.

These two cases highlight how the factual context of the disclosure of confidential information, as well as the existence of other Rules violations, can justify a lesser or stricter sanction for attorneys. The *Slaughter* case involved a lesser sanction for a single Rule 1.6 violation, and Mr. Johnson was found here to have violated additional Rules with the presence of additional aggravating factors. And while the method of disclosure in *Vogel* was more similar to Mr. Johnson's actions, the violations in that case included an improper sexual relationship that justified a more substantial sanction. 482 S.W.3d at 540–45.

Ultimately, we do not see any justification in our case law to alter Mr. Johnson's sanction for purposes of uniformity of punishment.

*Potential Injury*

Finally, Mr. Johnson argues that Ms. Howard did not suffer any actual harm. While it is not entirely clear, Mr. Johnson appears to be arguing that the lack of actual injury entitles him to a lesser punishment. Regardless, his argument fails. The Board did not allege actual harm, and the hearing panel did not find any. But the hearing panel did find potential injury, which Mr. Johnson does not dispute in his briefing. ABA Standard 3.0 does not differentiate between potential or actual injury, and both ABA Standards 4.22 and 4.23 can apply where there is a showing of either potential or actual injury. ABA Standards 3.0, 4.22, 4.23. Certainly, a showing of actual harm to Ms. Howard could have been used as justification by the hearing panel for a more significant sanction, but a finding of potential injury is all that is required for section 4.22 to apply and suspension to become the presumptive sanction.

There was substantial and material evidence to support the hearing panel's finding that Mr. Johnson's violations had the potential to cause his client injury. Mr. Johnson exposed communications from a client going through a contentious divorce where custody of children was at issue that (1) detailed her position on substantive issues in the case that her husband could have used to his advantage, and (2) contained emotional and angry reactions that could have affected the trial court's opinion of her. It is good that Ms. Howard was apparently not actually injured by Mr. Johnson's violation, but the finding of potential for injury was supported by substantial and material evidence in the record.

## CONCLUSION

We "take[] seriously [our] obligation to supervise and regulate the practice of law." *Sneed*, 301 S.W.3d at 618. We issue licenses to those whom we deem qualified to engage in the practice of law and, when necessary, discipline attorneys who violate the rules governing the profession. *Id.* "[A] license to practice law in this state is not a right, but a privilege." *Id.* (citing *Milligan v. Bd. of Pro. Resp.*, 301 S.W.3d 619, 630 (Tenn. 2009)). "It is the duty of every recipient of [this] privilege to act at all times, both professionally and personally, in conformity with the standards imposed upon members of the bar as conditions for the privilege to practice law." Tenn. Sup. Ct. R. 9, § 1.

Mr. Johnson violated a foundational principle of the attorney-client relationship when he knowingly revealed confidential communications to and from his client. Based on substantial and material evidence, the hearing panel found that he published confidential information "in retaliation for her inquiries and requests." It is apparent from the email communications that Mr. Johnson and Ms. Howard had a contentious relationship, but that is no excuse for Mr. Johnson's actions. The public filing of embarrassing, confidential client communications is a breach of the sanctity of attorney-client confidentiality.

Mr. Johnson's actions showed a baffling lack of respect for his client's confidential information. It is not uncommon for an attorney to feel compelled to withdraw when the relationship with the client breaks down. And we have no doubt that this particular attorney-client relationship had reached that point. But if Mr. Johnson felt it was time to end the relationship, he could have filed a motion to withdraw citing "a breakdown in communication" or something similar. Courts in this state generally do not require more specific information, especially when that information may be protected by Rule 1.6. *See* ABA Comm. on Ethics & Pro. Resp., Formal Op. 476 (2016) (discussing attorneys' obligation to comply with Rule 1.6 when moving to withdraw from representation). If he felt that Rule 1.16 required him to disclose specific justifications for his withdrawal, he could have taken steps short of publicly filing confidential client communications, including: filing a motion to withdraw that informed the court that ethical rules prevented him from disclosing detailed justifications; contacting the Board for an informal ethics opinion; or even simply reviewing the Rules of Professional Conduct to see which may apply to his motion.[12] Mr. Johnson chose to do none of those things and, instead, violated his client's confidences.

The confidentiality of communications between a client and attorney is sacred. It is not to be violated or taken lightly. Lawyers sometimes have bad days and difficult client relationships, but that is not an excuse to violate a client's trust.

The hearing panel did not abuse its discretion when it suspended Mr. Johnson from the practice of law for three months with thirty days served as active suspension. There was substantial and material evidence to support the relevant findings and to apply ABA Standard 4.22 with suspension as the presumptive sanction. The hearing panel did not act arbitrarily or capriciously in reaching its findings or in determining the ultimate sanction. We therefore affirm the judgments of the hearing panel and trial court imposing a suspension of three months with thirty days served as active suspension along with additional CLE requirements. The costs of this appeal are taxed to Mr. Johnson, for which execution may issue if necessary.

_____
DWIGHT E. TARWATER, JUSTICE

---

[12] Mr. Johnson testified that he did not even research Rule 1.6 until approximately two weeks before his hearing.